IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT JAHODA and THOMAS KLAUS, <br><br> Plaintiffs, <br><br> v. <br><br> RXEED, LLC, <br><br> Defendant. | Civil Action No. 21-cv-0020 |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56, Plaintiffs Robert Jahoda and Thomas Klaus ("Plaintiffs"), by and through their undersigned counsel, hereby submit their Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment (ECF 50) ("Motion"), and respectfully request that this Court deny the Motion in its entirety or grant discovery in aid of responding to the Motion pursuant to Rule 56(d).

**I. BACKGROUND**

Plaintiffs are individuals with vision disabilities as defined in, and protected under, Title III of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"). CSMF[1] ¶ 7. Plaintiffs initiated this action on February 11, 2021, against Defendant, Rxeed, Inc. ("Defendant" or "Rxeed"). CSMF ¶ 1. Plaintiffs attempted to use Defendant's website, www.Rxeed.com (the "Website"), but were unable to because the Website is inaccessible to individuals with vision disabilities, such as Plaintiffs. CSMF ¶¶ 4, 8. Plaintiffs, through this action, seek a permanent injunction pursuant to 42 U.S.C. § 12188(a)(2) and 28 CFR § 36.504(a) which directs Defendant

---

[1] Plaintiffs' Concise Statement of Material Facts filed concurrently herewith ("CSMF").

to take all steps necessary to bring its Website into full compliance with the requirements set forth in the ADA, and its implementing regulations, so that its Website is fully accessible to, and independently usable by, blind individuals. CSMF ¶ 9. Notably, nowhere in its Motion, nor in Defendant's Affidavit, does Defendant deny that the Website is inaccessible to people with vision disabilities as Plaintiffs assert. (*See* ECF 50 and ECF 50-2).

This Court consolidated this action with *Kolesar v. DripDrop Hydration, Inc.*, Case No. 1:2021cv0020 (W.D. Pa.). (ECF 3). Prior to filing an Answer or engaging in any discovery, Defendant filed a Motion for Summary Judgment on March 31, 2021. (ECF 50). A majority of the Motion is dedicated to name calling directed at Plaintiffs and Plaintiffs' counsel in response to Plaintiffs asserting their private attorneys general rights under the ADA – the very enforcement mechanism contemplated by Congress in drafting the ADA. (*Id.* at 3-6). The balance of the Motino is based on disputed factual assertions and misapplication of controlling case law.

Although Defendant failed to file a concise statement of material facts as is required under Western District of Pennsylvania's Local Rule 56(B)(1), there seems to be only one fact material to Defendant's argument in its Motion: Rxeed claims that it does not, and never has, offered goods or services to consumers. (ECF 50). Attached to Defendant's Motion as Exhibit A is an Affidavit of Rxeed's President, Mr. Omar Hassad, similarly taking this position. (ECF 50-2, ¶¶ 7-8). Defendant's factual assertion that it does not and never has offer services to consumers is disputed by Plaintiffs.

At the time that Plaintiffs attempted to use the Website, the Website offered services to any individuals including Plaintiffs – indeed, prior to, and up until Plaintiffs attempted to use the Website, the Website had ***countless*** references to consumers and patients. CSMF ¶ 10-27. After this action was filed and in an apparent effort to avoid liability for its discriminatory conduct,

2

Defendant (first) removed <u>almost</u> every reference to "patient" or "consumer" on its Website, then (second) asserted under oath that the Website has never offered goods or services to consumers. CSMF ¶ 29; ECF 50-2.

Defendant's company was incorporated on April 29, 2018. ECF 50-2, ¶ 1. Until the initial filing of this action, Defendant's Website continuously marketed and offered its services to individuals and consumers. The Website offered a marketplace for consumers to start a bidding war between pharmacies and wholesale drug retailers in order to obtain the lowest price on their individual prescriptions. CSMF ¶ 10-27. Defendant charged a service fee to individuals and consumers who used the Website and who filled their prescription using the pharmacy that supplied the winning bid on the marketplace. CSMF ¶ 10.

This Court need not rely on the word of Plaintiffs or Plaintiffs' counsel as to the business model of Defendant, because it can simply review the information that existed on the Website up until and prior to the Plaintiffs' attempts at using the Website.

In the FAQ portion of the Website, Defendant stated that:

- Rxeed is a proprietary, web-based, confidential system that brings **<u>consumers</u>**, drug wholesalers and independent pharmacies together in an open, competitive marketplace for prescription drugs.

- Rxeed connects **<u>Consumers</u>**-Independent Pharmacies-Wholesalers all in one platform.

- Using Rxeed is easy. Log on with your unique user ID and password and click on " Request Bid ". Enter the drug (product) name in the search box or click on a drug from the list and strength desired. Then enter the quantity, directions or duration in the required fields. All pharmacies in your service area, including mail order pharmacies, bid for your prescription & services.

- You do not have to provide any Credit Card information in order to register or start an auction on the Rxeed website. However, some personal contact information like address, phone number, and email, are required. **<u>You will be required to pay for $2 services fee if you accept winning Bid and receive email valid for 7 days with wining [sic] bid price and pharmacy information to finalize the prescription filling process</u>**. You may choose to give your credit card to the pharmacy that won the bid for a quick and easy check out or delivery.

3

CSMF ¶ 10. Further, in a section of the Website titled "How Rxeed Works" Defendant stated:

> Rxeed.com opens up an entirely new world of comparison drug shopping. Rxeed.com is leading this change, **allowing patients to receive the lowest possible pricing on the medications they need most through a market system of electronic, transparent competition**. Rxeed is a virtual community consisting of **patients**, independent pharmacies and drug wholesalers on one platform uniquely designed to benefit all.

CSMF ¶ 11. On the same page, the Website has a subsection titled "For patients" that stated, among other things, "Rxeed.com is accessible from any computer or mobile device with access to the Internet, anytime, 24 x 7 x 365." CSMF ¶ 12.[2]

On another page of Defendant's Website titled "Why do I need Rxeed", Defendant compared itself to Amazon, proclaiming: "Like Amazon.com is for many products, Rxeed is a secure website **that allows patients** to make better decisions when purchasing medications. Rxeed provides the information **patients** and prescribers (Independent Pharmacies and Wholesalers) need to choose the best value drugs; then get bids from pharmacies that want to win new prescription business." CSMF ¶ 13. Again, recognizing that the Website is for patients, Defendant continues, "It is a virtual community bringing together patients, independent pharmacies and drug wholesalers." CSMF ¶ 13.

On another page of the Website titled "Testimonials", Defendant included a comment from an individual identified as "Samuel O." dated June 26, 2019, stating "I paid almost $100.00 more for a prescription at the CVS Pharmacy than I would have bidding through Rxeed.com. I paid $179.50 after running my insurance card through. The price on Rxeed.com was just $79.68. Thank you Rxeed.com". CSMF ¶ 14. Similar testimonials from Susan J., Ron F., and Vincent J. are also present on that page and detail their experience as a consumer of the Website. CSMF ¶ 14. These testimonials conspicuously disappeared after this lawsuit was filed.

---

[2] This assertion of accessibility was not true, however, for people who are blind, like Plaintiffs.

On the bottom of that page, there was a "Patient Sign Up" link. CSMF ¶ 15. Upon clicking the link, the Website displayed the following information directed to patients:

- Rxeed.com is accessible from any computer or mobile device with access to the Internet, any time, 24 x 7 x 365.
- Rxeed.com lets you choose how much you pay for prescription drugs by letting multiple pharmacies bid their lowest price for your medication and required services.
- Rxeed.com lets you get transparent competition from both retail and mail order pharmacies, at the same time. Competition lowers prices and improves services and quality; it's good for both retail and mail order pharmacy.
- Rxeed.com has a locate feature that locates who stocks the medication you need.
- Rxeed.com offers CMR- Comprehensive Medication Review, A thorough consult regarding all patients medications that benefits drug adherence and compliance, coverage of drug interactions or possible drug duplication to name a few areas of concern.
- Rxeed.com features "Contact a Compounding Pharmacy". Hard to make and hard to find compounded medications are no longer a cause of frustration for you. Simply input your compound information and Rxeed.com will search for a compounding pharmacy to fill your compound.
- See FAQ section for more details. ( Service fees apply ).
- There are NO fees for patients to join Rxeed. Sign up for FREE Today!

CSMF ¶ 15. Upon registering, patients must then enter their name, address, date of birth, email, and create an account. CSMF ¶ 16. At the time that Plaintiffs attempted to use the Website, there was a running counter of the number of individual patients registered through the Website to obtain Defendant's services. CSMF ¶ 17. According to the Wayback Machine archives, as of August 15, 2019, the Website boasted that Rxeed had 3,500+ registered patients (CSMF ¶ 17):



As of January 27, 2021 – a mere two weeks before this action was filed – the Website boasted that Rxeed had 5,500+ registered patients (CSMF ¶ 17):



The Website separately identified the number of pharmacies (1000+), wholesalers (12+), and doctors (50+) that were registered for its online marketplace. *Id.* Within two months of advertising itself as providing services to more than 5,500 individual patients, the President of Rxeed filed a sworn affidavit stating that "Since the date of its creation until present, Rxeed, LLC has only conducted business with institutional clientele in the healthcare industry, and has not conducted any business whatsoever with the general public or any individual human beings." (ECF 50-2).

In a podcast entitled The Rxeed Difference: Dynamic Drug Marketplace, Mr. Omar Hassad, President of Rxeed and the affiant on behalf of Defendant, explains that the business model of Rxeed is to connect consumers with pharmacies in order to obtain the lowest price on prescription drugs. CSMF ¶ 18. Mr. Hassad then explains one of Rxeed's features specific to consumers wherein the patient can upload their medication to the Website, even if it's an unknown compound such as "magic cream," Rxeed will then contact that patient's physician and obtain the compound formula of that "magic cream," and will "find a pharmacy that's licensed in your state - a compound pharmacy - and will connect you [the patient] with them without you having to leave the comfort of your home." CSMF ¶ 18. Mr. Hassad continues, "Rxeed.com made it easy for the consumers." CSMF ¶ 18. He then claims that the goal is to get the "millions and millions of consumers" on the platform. CSMF ¶ 18.

6

In the August – September 2018 issue of a magazine entitled Pharmacy Edge, Mr. Hassad himself is quoted as saying "I firmly believe that Reed platform will forever change the way pharmacies will interact with consumers and wholesalers." CSMF ¶ 19. The article continues to discuss the process in which consumers start an auction for their medication, and how the Website has a "Locate a Medication" feature for consumers to find local pharmacies with their medication in stock. CSMF ¶ 20.

Finally, Mr. Hassad has submitted patent application number 20190147994 dated May 16, 2019, describing the same business model of Rxeed and in which the word "consumer" is used 108 times and "patient" is used 16 times. CSMF ¶ 21. Under the "Field of the Invention" section, the patent application states: "The present invention relates generally to a method for managing distribution of pharmaceutical medications. More specifically, the present invention relates to an online market place for a supply chain where consumers acquire pharmaceutical medications from local pharmacies and pharmacies to acquire pharmaceutical medications from wholesalers." CSMF ¶ 22.

Now, conveniently, the aforementioned portions of the Website have been removed, and Defendant's position is that it **never** targeted or provided goods or services to individuals. CSMF ¶ 32; ECF 50-2. Even more astonishing, Defendant seeks cause as to why Plaintiffs should not be forced to pay sanctions for initiating this lawsuit. Motion at 7. Despite its efforts to remove any consumer-based content from its Website before filing its Motion, the Website continued to reference "consumers" even after the date of the Motion. CSMF ¶¶ 23-27. One example includes the Commercial Use Agreement– an agreement that patients had to review and agree to prior to creating an account on the Patient registration page– that was still active on the Website as of April 6, 2021. CSMF ¶ 23. In its Consumer Use Agreement, Defendant states:

> Rxeed makes no assurances that information **provided by consumer participants of Rxeed ("Consumers")** or wholesalers and distributors of pharmaceutical products ("Wholesalers") is true and accurate. Rxeed is simply a platform **whose sole purpose is to connect You with Consumers through its online auction platform.**

CSMF ¶ 24 (emphasis added). Notably, this content was removed from the Website within the last week. CSMF ¶ 25. The current Terms and Conditions active on Defendant's Website as of the date of this filing references "consumers" in the following context, indicating that consumer information is still being collected through the Website:

- **Pharmacies/wholesalers** on Rxeed platform (Rxeed.com) agree not to use or sell any pharmacy/consumers information obtained from Rxeed platform (Rxeed.com) for any purpose beyond finalizing transaction took place on the Rxeed platform (Rxeed.com). Any pharmacy or wholesaler who violate this agreement will face fines ($250,000 per incident) and privileges on Rxeed platform will be terminated.

- **Penalties.** Participants will be subject to a penalty of $100,000.00 if they try to capture information from Rxeed.com and use such information for purposes other than filling prescriptions. Independent pharmacies and consumers that are participants of Rxeed shall be subject to a fine of $250,000.00 if Rxeed determines that you routinely access the website to monitor pricing of pharmaceuticals for the benefit of non-participating pharmacies.

CSMF ¶ 26. In its current version of Privacy Practices, the Website makes references to "Consumer Consent Requirements" that users must agree to before using the Website. CSMF ¶ 27. Further, there is still a login portal on Defendant's Website where it appears registered patients can still access services through the Website. CSMF ¶ 28. Therefore, it appears that Defendant *still* operates under the same framework as it did prior to this lawsuit being filed, and *still* provides services to consumers. In doing so, Defendant discriminates against individuals with vision disabilities under the ADA for not making the Website accessible to such individuals.

Plaintiffs' goal is for the Website, as well as other websites that they would like to use, to be accessible to them. Through their litigation efforts, Plaintiffs have obtained robust injunctive relief under the ADA and expanded accessibility of the internet for themselves and others with

vision impairments – something that proved to have increased value during the Covid-19 pandemic where online orders and services became not only commonplace, but necessary. To be clear, Plaintiffs *do not* seek to have valuable services, such as Defendant's online marketplace in which consumers may find medications for the best price, be wholly discontinued to the general public. At this time, however, because discovery has not been conducted, Plaintiffs are not clear whether Defendant (a) incorrectly marketed its services to Plaintiffs before this action was filed; or (b) makes an incorrect assertion to this Court that it does not provide and never provided services to individuals/patients. The factual information provided herein by Plaintiffs, at minimum, create a material dispute of fact. To the extent the Court does not deny the Motion outright, Plaintiffs request discovery, pursuant to Rule 56(d), in order to determine whether Defendant has created a façade in an effort to support its Motion, or if its assertions that it does not do business with consumers is true (making its recent marketing of services for Plaintiffs and others not true).

## II.  ARGUMENT

### A. *Summary Judgment Standard*

Summary judgment should be denied unless the movant meets its burden to show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable trier-of-fact could find in favor of the non-movant." *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.,* 691 F.3d 294, 300 (3d Cir. 2012). "A dispute is material if it could affect the outcome of the case." *Id.* The court "must draw all reasonable inferences in favor of the non-moving party. . . ." *Id.*

### B. *Defendant's Website is a Place of Public Accommodation Under the ADA*

Defendant's argument that the Website is not a place of public accommodation contradicts the law of this Court. Title III of the ADA provides that "[n]o individual shall be discriminated

against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations *of any place of public accommodation* by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a) (emphasis added). The legislative history of the ADA demonstrates that Congress intended the term "public accommodation" to be "construed liberally" in harmony with the ADA's broad purpose. *See* S. Rep. No. 101-116, 59 (1990) ("[W]ithin each of these categories, the legislation only lists a few examples and then, in most cases, adds the phrase 'other similar' entities. The Committee intends that the 'other similar' terminology should be construed liberally consistent with the intent of the legislation…"); *see also* H.R. Rep. 101-485 (III) at 54, *reprinted in* 1990 U.S.C.C.A.N. at 477 (same). Congress intended that "the types of accommodation and services provided to individuals with disabilities, under all of the titles of this bill, should keep pace with the rapidly changing technology of the times." *Id.* at 108, *reprinted in* 1990 U.S.C.C.A.N. at 391 (cited in *Nat'l Ass'n of the Deaf v. Netflix*, 869 F. Supp. 2d 196, 200-01 (D. Mass. 2012) ("*Netflix*")).

As Congress wisely foresaw, "technological advances can be expected to further enhance options for making meaningful and effective opportunities available to individuals with disabilities." *Id.* Despite the plain intent of Congress that the ADA should apply broadly and not be interpreted narrowly, Defendant reasons that the phrase "place of public accommodation" requires a physical location. Motion at 8. This Court has considered and rejected this argument on numerous occasions. *Gniewkowski v. Lettuce Entertain You Enterprises, Inc.*, 251 F. Supp. 3d 908 (W.D. Pa. Apr. 21, 2017); *Suchenko v. ECCO USA, Inc.,* 2018 WL 3660117 (W.D. Pa. Aug. 2, 2018); *Suchenko v. ECCO USA, Inc.,* 2018 WL 3933514 (W.D. Pa. Aug. 16, 2018).

*Gniewkowski* is directly on point with the instant case. In *Gniewkowski*, this Court considered nearly identical claims against two separate defendants: Churchill Downs Incorporated ("Churchill") and AmeriServ Financial Bank ("AmeriServ"). With respect to Churchill's websites, the *Gniewkowski* plaintiffs asserted that access barriers denied their full and equal access to "the information they need to participate in [Churchill's] online gaming and betting platforms, such as information on handicapping, wagering, live odds, and calendars of events taking place at Churchill's physical locations." *Id*. at 912. Similarly, as to AmeriServ's website, the plaintiffs alleged that access barriers prevented them from using their screen readers to "research the personal banking services AmeriServ provides." *Id*. at 913. In Churchill, the plaintiffs claimed these barriers negatively impacted their ability to frequent Churchill's brick-and-mortar locations. *Id*. at 919. To the contrary, the plaintiffs in Ameriserv claimed they were deterred from returning to AmeriServ's website, only. *See* Complaint for Permanent Injunction, *Frazier et al v. AmeriServ Financial Bank*, No. 2:17-cv-00031-AJS, ¶ 22 (Doc. No. 1) (Jan. 6, 2017) ("If the Website were accessible, Plaintiffs could independently bank and research personal banking services via Defendant's Website.").

In resolving these cases, this Court appreciated what Rxeed does not: that plaintiffs state a proper claim under Title III of the ADA when they encounter access barriers on a website owned, operated, or controlled by a public accommodation that interferes with plaintiffs' full and equal access of that public accommodation's goods or services.

Defendant's own reading of *Gniewkowski* is correct in acknowledging that this Court has recognized that websites are a place of public accommodation under the ADA in instances where the website offers services to the public. Motion at 10. Defendant's only distinguishing argument from *Gniewkowski* is that "Defendant Rxeed provides neither goods nor services to individual

consumers, such as the Plaintiffs herein, blind or otherwise." *Id*. As stated herein, that position is contradicted in almost every aspect, including by statements made by Defendant's own President. Indeed, at least at one point in time when Plaintiffs tried to use the Website, Rxeed's business model relied on patients registering and starting an auction for prescription drugs. And, at least up until the Plaintiffs attempted to use the Website, Defendant had a source of income from a $2.00 service fee charged <u>to patients</u> for using the <u>services</u> of the Website.

Defendant's reliance on *Ford v. Schering-Plough Corp.*,[3] and *Peoples v. Discover Fin. Servs., Inc.*,[4] is misplaced.[5] This Court has already distinguished both of those cases in *Gniewkowski*, stating:

> In both of the above cases, the Court of Appeals did not wish to expand the meaning of "place of public accommodation" to include places where: (1) an insurance policy was issued or implemented, or (2) a credit card company's processing terminals were located. Importantly, however, in both *Ford* and *Peoples*, the alleged discrimination occurred at a location where neither the insurance carrier in *Ford,* nor the credit card company in *Peoples,* had ownership or possession, or exercised control.

*Gniewkowski*, 251 F. Supp. 3d at 918. Because the defendant in *Gniewkowski* owned, operated, and controlled the property (the website) through which individuals access service, this Court found that the website was a place of public accommodation under the ADA. *Id.* So too is the case here: Defendant owns, operates, and controls the Website through which individuals can access its services. CSMF ¶ 2-3. Therefore, Defendant's Website is a place of public accommodation under the ADA.

---

[3] 145 F.3d 601 (3d Cir. 1998).
[4] 387 F. App'x 179 (3d Cir. 2010).
[5] Defendant's other cases cited in support of its position are from outside Circuits and are not binding on this Court.

C. *Plaintiffs' Claim Does Not Violate the U.S. Constitution*

Defendant also incorrectly asserts that Plaintiffs' ADA claim violates due process because there are no explicit Department of Justice guidelines on the issue. Defendant relies exclusively on a **non-binding** and **overturned** case from the Central District of California. *See Robles v. Domino's Pizza, LLC*, 2017 WL 1330216 (C.D. Cal. Mar. 20, 2017). Defendant implicitly acknowledges that *Robles* was overturned by placing the current prevailing case citation in footnote 8 of the Motion, in which the Ninth Circuit Court of Appeals held:

> we conclude that the district court erred in holding that imposing liability in this case would violate Domino's due process rights. Domino's has received fair notice that its website and app must provide effective communication and facilitate "full and equal enjoyment" of Domino's goods and services to its customers who are disabled. Our Constitution does not require that Congress or DOJ spell out exactly how Domino's should fulfill this obligation.

*Robles v. Domino's Pizza, LLC*, 913 F.3d 898, 909 (9th Cir.), *cert. denied*, 140 S. Ct. 122 (2019).

This Court has already held that the Department of Justice need not issue specific regulations for website activity for a violation of the ADA to be sufficiently pleaded:

> Defendant essentially argues that Plaintiffs' Complaint must be dismissed because the DOJ has never issued implementing regulations for website accessibility. Defendant reasons that because the DOJ has failed to implement regulations for website activity, the Plaintiff cannot sufficiently plead an ADA violation for the website activity she was precluded from enjoying. This Court disagrees.

*ECCO USA*, 2018 WL 3660117, * 2. This Court should find the same here and deny Defendant's Motion.

D. *If the Motion is Not Denied Outright, Plaintiffs Should Be Provided an Opportunity for Discovery Under Rule 56(d)*

Fed. R. Civ. P. 56(d) provides where a non-movant shows it cannot present facts essential to its opposition the Court may defer consideration of a motion, allow discovery, or issue any other appropriate order. As set forth above, and in Plaintiffs' supporting material (including the Attorney Declaration of Nicholas Colella), when Plaintiffs attempted to use the Website it provided services

to the public and Plaintiffs do not have information about what, if anything, changed in the business function of Defendant between the advertising and marketing on the Website at late as January 27, 2021 and the filing of Defendant's Motion two months later where the Website was wholly changed. To the extent this Court does not outright deny Defendant's Motion, Plaintiffs should be provided an opportunity to take discovery related to the Motion and, thereafter, an opportunity to supplement their opposition. Based upon the information provided herein, Defendant's factual basis for its Motion is questionable, at best. Plaintiffs have provided *prima facie* evidence that, at the very least, there is a genuine dispute as to the most material fact at issue in this action.

### E. *Defendant's Unfounded and Irrelevant Attacks on Plaintiffs' Litigation Histories Should be Wholly Disregarded*

Defendant spends a significant amount of time and effort in its Motion insulting Plaintiffs (and Plaintiffs' counsel) in lieu of any legal analysis. According to Defendant, individuals with disabilities seeking to enforce their rights against discrimination are "egregious,"[6] "lubricious,"[7] "baseless,"[8] "unlawful,"[9] and "vexatious"[10] "attempts at extortion."[11] These allegations are unsupported, and have no relevance to Defendant's discriminatory conduct under Title III.

In support of its Motion, Defendant submitted dockets related to Plaintiffs' various ADA cases. However, Defendant omits any case law to support that Plaintiffs' assertions of their legal rights in any way relieves Defendant of its obligations under the ADA. Congress specifically included a private cause of action under the ADA, and a fee-shifting provision, permitting prevailing plaintiffs to recover their attorneys' fees. *See* 42 U.S.C. § 12205 and 12188(a)(1)

---

[6] Motion at 4.
[7] *Id.* at 4.
[8] *Id.* at 4, 5, 7.
[9] *Id.* at 4, 7.
[10] *Id.* at 5.
[11] *Id.* at 4, 5, 7.

(incorporating by reference Title II of the Civil Rights Act ("CRA"), 42 U.S.C. § 2000a-3(a)); *see also McLendon v. Continental Group, Inc.*, 872 F. Supp. 142, 156 (D. N.J. 1994) ("Fee-shifting provisions are designed 'to encourage private enforcement of the statutory substantive rights.'"). It has been recognized that, by incorporating CRAs remedial provisions into Title III of the ADA, Congress similarly enlisted private litigants to enforce their rights under the ADA as private attorney generals. *See Nanni v. Aberdeen Marketplace, Inc.*, 878 F.3d 447, 457 (4th Cir. 2017) (explaining that our country will be obligated to rely, in part, on private litigation under the ADA as a means to secure compliance with it); *Dudley v. Hannaford Bros. Co.*, 333 F.3d 299, 307 (1st Cir. 2003) (similar).[12] "For the ADA to yield its promise of equal access for the disabled, it may indeed be **<u>necessary and desirable for committed individuals to bring serial litigation advancing the time when public accommodations will be compliant with the ADA</u>**." *D/Lil v. Best W. Encina Lodge & Suites*, 538 F.3d 1031, 1040 (9th Cir. 2008) (internal citations omitted) (emphasis added). Defendant's attacks on Plaintiffs are baseless and not relevant to its Motion.

---

[12] The ADA also allows for tester plaintiffs to bring lawsuits to stop discrimination. *See* 42 U.S.C. § 3604(b); *compare* 42 U.S.C. 12182(a); *see also Evers v. Dwyer*, 358 US 202, 204 (1958) ("holding that an African-American plaintiff who rode a segregated bus for the sole purpose of instituting litigation had standing"); *Pierson v. Ray*, 386 US 547, 558 (1967) ("The petitioners had the right to use the waiting room… and their deliberate exercise of that right in a peaceful, orderly, and inoffensive manner does not disqualify them from seeking damages under § 1983."); *Colorado Cross Disability Coal. V. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1211 (10th Cir. 2014) (holding that "testers have standing to sue under Title II of the ADA … we believe the same is true for Title III of the ADA . . . Like Title II, Title III provides remedies for 'any person' subjected to illegal disability discrimination."); *see also Heinzl v. Cracker Barrel Old Country Stores, Inc.*, No. CV 14-1455, 2016 WL 2347367, at *21 (W.D. Pa. Jan. 27, 2016), *report and recommendation adopted as modified*, No. 2:14-CV-1455, 2016 WL 1761963 (W.D. Pa. Apr. 29, 2016).

### III. CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court deny Defendant's Motion for Summary Judgment. Alternatively, Plaintiffs request discovery under Fed. R. Civ. P. 56(d).

Dated: April 15, 2021                                    Respectfully submitted,

*/s/ R. Bruce Carlson*
R. Bruce Carlson
bcarlson@carlsonlynch.com
Nicholas A. Colella
ncolella@carlsonlynch.com
**CARLSON LYNCH, LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Phone: (412) 322.9243

*Attorneys for Plaintiffs*